# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>JAMES MCNAMARA,<br>Also known as "Mac,"<br><br>           Defendant. | 23 CR 119<br><br>Hon. Amy Berman Jackson |

## SENTENCING MEMORANDUM ON BEHALF OF JAMES MCNAMARA

Defendant, James McNamara, by his attorneys, Breen & Pugh, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3553(a), the Sixth Amendment to the Constitution of the United States, and the Supreme Court's opinion in *Gall v. United States*, 552 U.S. 38 (2007), respectfully submits his sentencing memorandum.

Dated: August 3, 2023,

<div style="margin-left:50%">

BREEN & PUGH

By:   /s/ Thomas M. Breen
Thomas M. Breen
Robert W. Stanley
Christopher W. Dallas

53 W. Jackson Blvd.
Suite 1550
Chicago, IL 60604
(312) 360-1001
tbreen@breenpughlaw.com

</div>

## Introduction

James McNamara pled guilty to one count of Assaulting a Federal Officer, in violation of 18 U.S.C. § 111(a). He now appears before the Court prepared to be sentenced for his conduct on January 6, 2021. In this case, his conviction offers only a glimpse into a resilient and difficult life. Mr. McNamara is devoted to his family, faith, community, and helping others. As described in the letters of support submitted on his behalf, Mr. McNamara has positively impacted the lives of his family, friends, and many others he has met throughout his life. From being a devoted husband and father, to being committed to volunteering himself for charitable endeavors, Mr. McNamara embodies philanthropy and generosity into his core values. And the fact that he possesses the charitable nature to help his community so devoutly, considering the extreme hardships he endured as a child and his troubled youth, is nothing short of an admirable achievement.

Sentencing a criminal defendant is one of the trial court's most important yet difficult tasks. Determining the appropriate sentence "requires a court to consider with great care and sensitivity, a large complex of facts, and factors." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). The Supreme Court has stated that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States,* 131 S. Ct. 1229, 1239-40 (2011) (quoting *Koon v. United States,* 518 U.S. 81, 113 (1996)).

It is essential that a court's sentencing decision be informed and guided by the fundamental doctrines of mercy and compassion. *See United States v. Blarek,* 7 F. Supp. 2d 192, 210 (E.D.N.Y. 1998). While these principles are not specifically delineated as rationales for sentencing, they are evidenced by the federal sentencing statute's mandate that the court impose the lowest possible punishment to accomplish the goals of sentencing. *Id.;* 18 U.S.C. § 3553(a) (the court shall impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing). As the Second Circuit recently explained:

> Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge." Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007). While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of "the diverse frailties of humankind." *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion). In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513 (1993); *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979), reprinted in 82 F.R.D. 209, 209 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases").

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

A sentence within the Guidelines range is "greater than necessary" to accomplish the goals of sentencing. Mr. McNamara requests the Court to impose a sentence far below the low-end of the Guidelines range, along with any other conditions the Court deems necessary, fair, and just under the circumstances. Such

a sentence reflects the seriousness of the offense, while, at the same time, considers, Mr. McNamara's otherwise good character, his history of community service, and the collateral consequences that follow his conviction.

### Mr. McNamara's Personal History and Characteristics

To understand the person before the Court, one must appreciate Mr. McNamara's life. Like many people, his life is best examined in different stages. Starting with an analysis of his actions on January 6, 2021, would paint an incomplete portrait of a complex man who has survived in the worst environments, reacts in the most emotional of times, and never forgets the sins of the past and the good that he can do in the present. He does not view himself as a victim or describe himself as saintly. Those who knew how and where he grew up might say he was a victim of his surroundings. And those who have known him for the last several decades and have seen his good deeds, generosity, and commitment to the poor might say he is saintly.

His heartbreaking childhood is a good place to start. Very few of us can begin to understand what he, his siblings, and his mother went through as they lived on the west side of Chicago. PSR ¶ 65. Mr. McNamara grew up in an impoverished and crime ridden neighborhood, in the shadows of Chicago's historic icon of dread, hopelessness, and executions, the Old Cook County Jail. Built in the late 20's and still housing inmates until recently when it was torn down.

His father, James, was a hardworking boilermaker in Chicago, and he was also a generous family man. *Id*. at ¶ 68. As a result of that generosity, James let his

brother-in-law stay with the family because he was jobless and homeless. *Id.* at ¶ 65. One evening, after a violent tantrum, the brother-in-law shot James in the head from point-blank range, executing James in the threshold of the family home in front of the family. *See* Letter of Joyce Couhglin.

James and his family had been willing to share the little it had with a man in extreme need, that man in return shot James. From that point on, the children were fatherless, and circumstances became much tougher. What lesson does a little boy, and his siblings learn from that horror? And if there is a lesson, how will it manifest itself in the future? Therein lies the complexity of the man to be sentenced, James Michael McNamara. He has been called "Mac" most of his life and referred to as such in the indictment.

His past explains so much about his earlier transgressions. That same past explains the character, kindness, and generosity he has shown later in his life. As a child he was cold in the winter, and hungry year-round. He wore the clothes of a poverty-stricken urchin, lost his father at age 2, survived his mother's successive abusive boyfriends, and helped support his mother, sisters, and brother when in any way he could.

Mac's father was a good man, worked hard as a boilermaker, and was able to provide the basics for his family of six children. PSR ¶ 68. After his death, Mac and the family were impoverished and relied on government aid and donations from the church and school. PSR ¶ 65. Mac's mother, Joyce, was ironically disowned by her own family as retaliation for cooperating with the Cook County State's Attorney's

Office in prosecuting her brother for the murder of her husband. *Id*. Joyce's brother was incarcerated in that very Cook County Jail that shadowed Mac's home and Joyce and her children were left without any help from her husband's family.

The most succinct and accurate recounting of Mac's youth can be found in the June 7, 2023, letter written to the Court by Mac's sister, Joyce McNamara Coughlin, a Registered Nurse, mother, and grandmother:

> At age 2, MAC and his five siblings (10, 8, 5, 3, 2, 6mo) witnessed the horrific murder of his father, age 32, at the hand of his mentally ill maternal uncle, dad died instantly of a fatal head gunshot wound. Mac lost his father, hero, breadwinner, school, church, neighborhood, community, home, becoming homeless. Our mother, aged 30, was never the same mentally after dad's death. Mac's life was forever changed.
>
> Mac's childhood was marked by homelessness, instability, hunger, lack of medical care, dental care, eye care, food, basic of necessities, love, and care. For two to three years after Dad's, death we were separated and homeless, shifted from home to home, sleeping in basements and attics, taken to Moose Heart orphanage, and taken out. During the most important years of Mac's life for physical, emotional, psychosocial development, his life was impacted with multiple adverse childhood experiences that were in place for his entire childhood.
>
> Once in school, Mac had many challenges in learning, problems with his vision, no glasses, clothing, care, or school supplies. The best meal we had daily was the free lunch we received at school. From the age of five to when he dropped out of high school, Mac moved more than 10 times and attended multiple grammar schools and high schools disrupting his access to education. Mac's childhood was marked by loss after loss after loss, disruption, deprivation, instability, abandonment, and foreclosed opportunities due to the instability of the home and loss of his father. Additionally, Mac lost his best friend and little brother Michael in a fatal motorcycle accident at age 20.

Mac often ran away from home to avoid his mother's abusive boyfriends. PSR ¶ 66. His neighborhood provided him with plenty of kids to hang with. The expression used to describe the future of the kids in Mac's community is descriptive of several

other Chicago neighborhoods, "they all became either cops or convicts." As the family struggled, Mac and his siblings became the object of bullying, easy targets because of how they dressed and the family's history. Mac and his siblings did their best to help their mother by shining shoes and collecting bottles to contribute financially, however small, to support each other. *Id*. at ¶ 65.

Never a good student, he graduated from 8th grade and the family moved to Tucson, Arizona. *Id*. While there, at age 17, Mac ran away from home and moved on to Dallas, Texas, where he supported himself working on a dairy farm. *Id*. at ¶ 66. Then, after a year or so, Joyce decided to move back to Chicago, she took the family to Dallas to pick up Mac and they returned to Chicago where Mac has lived ever since. *Id*.

While Mac always worked hard, his path crossed with the police. Mac was involved in fights, arrests, and charges that went to court, only to be dropped. He was drinking too much, out too late, and hanging with "the wrong crowd." Mac has long ago come to grips with the fact that his run-ins with law enforcement were the result of his drinking and drug use. That acknowledgment is what has allowed him to move on from those days and better his life by focusing on positive activities that help his family and his community. His one arrest in 2014 for retail theft was a misdemeanor, that resulted in a sentence of supervision, which in Illinois is not a conviction and results in the charges being dismissed after one year. *Id*. at ¶ 8

At one point, Mac checked in to inpatient substance abuse treatment at Advocate Christ Medical Center in Oak Lawn, Illinois. *Id*. at ¶ 91. Within two days

he had an epiphany. In a moment of clarity, he decided that he wanted to live and be a better husband and father. By then, he had seen firsthand the deaths and imprisonments of many of the people he grew up with. As he told Linda Wolff during the presentence interview, he looked around and realized that 90% of his friends had been killed, died of an overdose, or were imprisoned. *Id*. at ¶ 67. He desperately wanted to ensure his children knew their father would be there for them.

Mac has had a history of steady employment, earning vocational certifications along the way leading him to become a jack of all trades. In 1982, Mac received a heavy equipment training program certification through Job Corps and International Union of Operating Engineers reflecting his qualifications to operate heavy machinery. PSR ¶ 97. In 1991, he earned a certification in carpentry through the Chicago and Northeast Illinois District Council of Carpenter Apprentice and Trainee Program. *Id*. In 1997, Mac earned a certification to be a hazardous waste site worker through RTE Environmental Solutions Inc. *Id*. Up until 2018, Mac was employed as a union journeyman carpenter through Carpenters Union Local 250. *Id*. at ¶ 100. Since then, Mac has owned and operated Fast Plumbing 247, LLC in Chicago. *Id*. at ¶ 99.

Mac and his wife, Dawn, have been married since May 5, 1990. *Id*. ¶75. They share three children, Nicole, Kelly, and James. *Id*. His three children are successful and gainfully employed. *Id*. Most importantly to Mac, he and his wife are very close with their children, and they speak almost daily. *Id*. Unlike his childhood, Mac strives to provide the structure and support that he was not entitled to growing up. *Id*

7

Mac had met Sister Teresa and several of the Missionaries of Charity while Sister Teresa was in Chicago. *See* Letter of Jim Coughlin. Jim Coughlin, his sister Joyce's husband, introduced Mac to the Missionaries of Charity in the 1980s. *Id*. Jim Coughlin had known Mac since he was a child and wanted him to meet the sisters and to see them serve the poor. That experience stuck with Mac to this day. *Id*. Jim, a retired Chicago Public School teacher, in his letter to the Court offers a few more insights into Mac:

> While his four older sisters benefited from the role modeling their mother did for them, Mac and his younger brother Mike (dead at the age of 19) suffered from the lack of a father figure. They were sometimes negatively influenced by their peers and some unsavory adults.
>
> I know Mac to have become a person who despites these economic and familial disadvantages, was able to rise above them and mature into a man who took responsibility for those around him. He started a successful small business despite his academic shortcomings.
>
> He and Dawn have managed to raise three responsible, hardworking young adult children in a difficult, gang influenced, environment.
>
> ***
>
>  I do know James McNamara and I believe he will continue to be a great contributor to his community if given the opportunity. His presence and ongoing contributions to neighbors and the missionaries of charity would be sorely missed.

At some point, he is unsure of the timing, Mac reflected on his childhood and wanted to make sure that his children did not suffer as he did during his youth. He had been immensely affected by the Missionaries of Charity more than he ever realized. They are known internationally to care for refugees, former prostitutes, the

mentally ill, sick children, abandoned children, lepers, people with AIDS, and the aged and convalescent. PSR at ¶67. Whatever Mac's private thoughts were, he consciously decided to be more like Sister Teresa's followers. He would take the skills he had honed over the years and help the sisters in their mission of providing food, shelter, and resources to the poorest of the poor, the most forgotten among us. He kept his full-time employment as a carpenter and plumber but answered every call for help from the missionaries.

There is not anything Mac cannot not fix. Mechanical, electric, plumbing, carpentry, he can do it all, and he does to this day. While running his plumbing company, he made many trips to the shelters, kitchens, and convents to fix, repair, and replace equipment. Mac's labor is free and so are the parts. To Mac, this is volunteer work, and he will pay out-of-pocket for the supplies needed to complete each job. For larger items, such as appliances, Mac will purchase them himself or find others to help contribute. His generosity has not been confined to Illinois, nor has he been the only McNamara to participate. His entire family volunteers, and his family, especially his wife, have supported Mac and his efforts with the Missionaries of Charity.

The emphasis here on the Missionaries of Charity is not done to brag or seek sympathy. It is fact, it is who Mac became in his adult years, long before he ever decided to go to Washington, D.C. He does everything out of humility. When we requested character letters, Mac was reluctant. He was ashamed of losing his temper on January 6, but that was only part of his reluctance. Mac just did not want to ask

for help from family and friends. However, Mac had kept dozens of thank you letters sent to him over the years. *See* Group Exhibit 2. These letters are more than a warm "thank you" for Mac's generosity, they reflect Mac's commitment to serve the poor and to give when no one else will. The sisters wrote to Mac, his wife, and their three children because the whole family assisted Mac in these endeavors. These projects were done in-state, out-of-state, during holidays, and during family vacations. Not one letter was solicited or requested, many were written before the charges in this case. And while the authors of these letters did not anticipate the letters would be used in a criminal case such as this, they are a true portrayal of Mac's character and the man he strives to be.

When finally reached out to ask for support in this case, there was a cascade of people who wanted to help the Court know about Mac's good character. *See* Group Exhibit 1. Many of the comments from Mac's supporters are similar to the thank you notes, but that is because Mac is what he is: a hardworking, generous, caring individual trying to help those who remind him of himself in his earlier years.

The support letters all speak of Mac's good deeds, commitment to the poor, and deep religious beliefs. Dr. Zadel, O.D., speaks of how Mac sought his help in giving eye exams to the sisters and how Mac offered to pay the costs. As Mac often does, he personally involved himself and brought the sisters in for their exams. Through some conversations, the doctor learned of the service the sisters perform. The doctor and his partner enjoyed the sisters so much, and Mac's presentation, that they have now

performed free exams and provided glasses for years. Mac knew how to get others involved in the cause. Dr. Zadel writes:

> During my time with the sisters, they spoke very highly of Mac working with the children in the community, helping at the soup kitchen, and sharing stories about he how he has saved the day when plumbing and other problems arise there. Our office is blessed multiple times a year with visits from sisters that have traveled to Chicago they bring a smile to everyone's face they interact with and inspire wellness.
>
> He is kind caring and in sharing individual and I truly believe that the friendship that we have developed has made me a better man, urging me to help those in need in my community.
>
> … Mac is honest, generous, highly motivated, and a wonderful mentor with an amazing positive attitude that has the ability to bring out the goodness in everyone he interacts with. He instills the "pay it forward" adage; when someone does something for you instead of paying that person back directly you pass it on to another person instead.

His three children, put together an album of just some of the photographs that have been collected over the last 20 years. *See* Group Exhibit 3. It was an act of love on their part but hopefully the Court will note the joy Mac brought to the Missionaries of Charity as he worked with them to improve the various projects. It has become apparent that Mac, his wife, and their three children have been welcomed into the family of the Missionaries of Charity. Who needed whom the most would be a wonderful study.

Whether it's one of Sister Teresa's missionaries or a local optometrist, each in their own way speaks of the joy Mac brings to those he helps. Ms. Loretta Grigler writes in her May 19, 2023, letter to the Court that Mac was her neighbor and when

11

she was having major problems with her 16-year-old son, she turned to Mac for help. She wrote:

> Mac took my only son under his wing. He mentored him how to get focused, have self-discipline and to hold himself at a higher level as a young man…

She gives all the credit to Mac who took her son to job sites and mentored him. She writes that she has witnessed him doing this for other children who need a father-figure to see the way. Ms. Grigler is so proud of her 30-year-old son who joined and served in the United States military and received an honorable discharge.

Maria Payne Hako left her abusive husband in 2019, she was pregnant, had three children, and was homeless. She met Mac through the Missionaries of Charity. Her June 28, 2023, letter tells the Court what Mac has meant to her and her family:

> Mr. Mack adopted my family, providing friendship, money, help with my auto, help moving us into an apartment, bought us a swimming pool for the backyard in the summer, groceries, food, and clothing for the children. In the winter he took all the children and got them new jackets, boots, gloves, and hat. He pays for everything …. Since I'm a single mother of four, he often offers me help to take the boys, the older children out and more. I do not have my family, but my children always have good times with his families. My children really love him.

One can pick out any of the letters that have been submitted, and the reader will understand what a remarkable person James McNamara is. He is not just trustworthy, he is trusting. To his fault, he trusts news sources like he trusts people. He does not have the ability to see through lies and propaganda. He keeps it simple: help, feed, shelter, and clothe the needy.

After working so hard, raising wonderful children, Mac wants to retire. He wishes to go to Kentucky and dedicate even more of his time and resources to helping those in need.

## The Nature and Circumstances of the Offense

On January 5, 2021, Mac and a man from his neighborhood drove to Washington, D.C. to support the president at the "Stop the Steal Rally." Due to his self-inflicted sources of news, Mac was under the belief that something nefarious had occurred in the 2020 presidential election. Initially, his presence there was meant only to show support for the president who, in Mac's mind, was a religious man who was anti-abortion and had nominated judges to the federal courts, especially the United States Supreme Court, who were similarly opposed to abortions.

When he woke up on January 6th, he and his friend began walking towards the rally where they planned on listening to the President and others speak about the election Mac had been tricked into thinking was stolen. Along the way, Mac and his friend met a store owner who they began talking with. The three men then walked together towards the rally which seemed to have ended as the crowd was leaving and walking towards the Capital. Mac was separated from his friend and the shopkeeper, so he continued to walk with the large crowd. As he made his way toward the Capital Mac struck up a conversation with police officers on motorcycles. Mac has ridden motorcycles for years and sat and talked to the officers about the crowd and motorcycles. One officer even let Mac sit on one of the motorcycles to get a feel for that particular bike.

Within the crowd that day there were those who wanted to do harm and planned to do harm. Mac was not one of them. He was never in a gang, hate group, or anti-democracy group. Moreover, unlike some individuals that attended the rally that day, Mac did not come prepared for violence or a confrontation with law enforcement. He did not bring a gas mask, bullet proof vest, pepper spray, or a weapon of any kind.

Mac then proceeded to follow the crowd and arrived at the Capitol building's West Terrace and proceeded to the North doors of the Capitol building Mac knew he should not have been on the Capitol grounds and saw that officers were actively trying to keep people from entering the Capitol building. While near the North doors, Mac was hit with pepper spray from officers trying to remove individuals from the building and the top of the stairs.  Mac lost his temper, and the video footage depicts Mac's conduct. Thankfully, Mac did not physically harm any of the brave officers.

Mac accepts complete responsibility for his actions. He does not blame others for his actions because he alone is responsible for his actions. He has pleaded guilty because he is guilty. Mac unlawfully reacted to events that unfolded around him. Mac should not have been on the Capitol grounds and the events that unfolded are entirely a situation of his own making. But in the end, there he was, with the crowd, frightening the officers who were risking life and limb to protect those in the Capitol and the proceedings that were under way.

14

## Other §3553(a) Sentencing Factors

**A.     The Need to Avoid Unwarranted Sentencing Disparities**

Understanding that no case is alike, an overview of similarly situated January 6th defendants charged with 18 U.S.C. 111(a) is an important consideration in an attempt to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6). Compared to a few of similarly situated defendants, a sentence below the low-end of the guidelines would be appropriate.

In *United States v. Mark Leffingwell*, 21 CR 5-ABJ. Mr. Leffingwell pled guilty to assaulting, resisting, or impeding a Federal Officer, in violation of 18 U.S.C. § 111(a)(1) pursuant to a plea agreement. 21 CR 5-ABJ, Dkt. No. 25. The parties agreed that Mr. Leffingwell faced the same advisory range as Mr. McNamara: 24 – 30 months. *Id*. Mr. Leffingwell entered the Capitol building and found himself face to face with a regrouped line of officers. *Id*. at Dkt. No. 31. Mr. Leffingwell then chanted at the officers. *Id*. When the officers pressed on the crowd to back them out of the doors, Mr. Leffingwell punched one officer in the head, then punched another officer in the head, and then punched the first officer again. *Id*.

This Court sentenced Mr. Leffingwell to six months incarceration and two years' supervised release. *Id*. at Dkt. No. 51. While it is true that Mr. McNamara clenched his fist and swung at an officer, he did not contact that officer. And while Mr. McNamara swung a bike railing at the doors of the Capitol building, nor did it contact officers. On the other hand, Mr. Leffingwell struck two officers in the head with his fist, one of them twice.

In *United States v. Sargent*, 21 CR 258-TFH. Mr. Sargent pled guilty to the following: (1) 18 U.S.C. § 231(a)(3); (2) 18 U.S.C. § 111(a)(1); (3) 18 U.S.C. § 1752(a)(1); (4) 18 U.S.C. § 1752(a)(2); (5) 18 U.S.C. § 1752(a)(4); and (6) 18 U.S.C. § 5104(e)(2)(F).

In that case, Mr. Sargent assaulted a member of the U.S. Capitol Police, first by swinging his open hand towards, and contacting, that officer, and then, 30 seconds later, swinging his open hand again towards the same officer, but instead contacting another member of the crowd. 21 CR 258-TFH, Dkt. No. 57. Specifically, Mr. Sargent, amongst a crowd at that point, stepped forward from the crowd and swung his open hand toward a U.S. Capitol Police Officer contacting that officer. *Id*. Another officer instructed Mr. Sargent, "Do not start attacking people." *Id*. Thirty seconds later, Mr. Sargent again emerged from the crowd, and swung his open hand towards the same officer defying the other officer's instruction. *Id*. And in the days that followed the insurrection, Mr. Sargent boasted about the riot and his actions during it on social media. *Id*. at Dkt. No. 71.

Mr. Sargent was sentenced to 14 months of incarceration followed by 24 months of supervised release. Not only did Mr. Sargent plead guilty to multiple felony offenses, but he also struck an officer with his hand. And, after being instructed not to attack the Capitol Police Officers, he attempted to do it again. Further, Mr. Sargent had the pomposity to broadcast his conduct on social media in the following days of the insurrection. These characteristics present in Mr. Sargent's offense, are not present in Mr. McNamara's.

16

In *United States v. Sherrill*, 21 CR 282-TSC. Mr. Sherrill pled guilty to assaulting, resisting, or impeding law enforcement officers, in violation of 18 U.S.C. § 111(a)(1). 21 CR 282-TSC, Dkt. No. 105. In that case, Mr. Sherrill acknowledge that he and his companion each picked up a metal pole that had been broken off from a metal bicycle barricade. *Id*. at Dkt. No. 104. While still carrying the metal pole, Mr. Sherrill entered the Capitol building through the Senate Wing door eight minutes after the initial breach of the doors. *Id*. He walked throughout the building, including the Crypt and Rotunda. *Id*. Mr. Sherrill admitted that he "picked up a metal pole from a bike rack barricade and used that metal pole to strike at an officer from the Metropolitan Police department." *Id*.

Mr. Sherrill was sentenced to seven months of incarceration and twelve months of Supervised Release. While Mr. McNamara picked up an object and used it, he did not direct that object at another officer, or any person for that matter. A sentence that significantly departs from Mr. Sherrill's sentence would constitute an unwarranted sentencing disparity.

The government cites to three January 6th cases arguing that those cases are suitable comparisons to the relevant sentencing considerations in this case. Dkt. No 36, pg. 18. In those cases, however, the defendants committed serious batteries against law enforcement officers. The defendant in *United States v. Richardson*, 21 CR 721-CKK, struck a police officer three times with a metal pole, only stopping because the pole broke in his hand. The government concedes that Richardson's conduct was "far more assaultive," but nonetheless uses the case as a comparison

because that defendant and Mac were both pepper-sprayed and initially lied to law enforcement during interviews. Dkt. No. 36, pg. 18. In *United States v. Clayton*, 22 CR 139-RCL, the defendant stole two shields, stole a baton, shoved an officer, and grabbed his face mask. In *United States v. Creek*, 21 CR 645-DLF, the defendant "grabbed an officer, drove him backward forcefully several feet, and hit him in the face shield of his helmet. Creek then shoved another officer in the shoulders, and then kicked him…" Dkt. No. 36, pg. 19.

The cases cited by the government are distinguishable. These defendants attacked and made physical contact with multiple law enforcement officers on January 6th.  Mr. McNamara's conduct was serious, it is not excusable or acceptable, but it was distinguishable from the three cases relied upon by the government.

**B.    Specific and General Deterrence**

While effective deterrence, both specific and general, may require a credible threat of incarceration, that does not mean a lengthy custodial sentence is necessary in every case.

**1.    Specific Deterrence**

For all the reasons articulated in the letters of support and the shame Mac feels for his actions on January 6th, he is not likely to re-offend. He does not carry with him any resentment or hate for anyone. He is not a violent man. He wants to be able to get back to what he does best, fulfilling the duties of husband, father, mentor, caregiver, and contributor to the communities that need his help. The Court need not sentence Mr. McNamara to a period of incarceration to deter him from committing

other offenses. He is aware of the fact that he may hear the jailhouse gate close behind him.

### 2.      General Deterrence

Frequently called the need to "send a message," incarceration can be a valuable tool for incapacitating and punishing offenders. Long prison sentences, however, do little to deter people from committing future offenses. Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime & Just. 199, 201 (2013) (finding that "there is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs"). In other words, the message being sent by unduly long prison sentences is a proven misguided approach.

"Current empirical research shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) deterrent effects.'" Amy Baron-Evans et. al., *Deconstructing the Career Offender Guideline*, p. 36 (April 2011), https://www.fd.org/sites/default/files (last visited on June 19, 2023), (citing Michael Tonry, *Purposes of Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006)).

So far, 70 defendants have been sentenced for violating 18 U.S.C. § 111(a) pertaining to the events that occurred on January 6, 2021. Of those defendants, 69 have been sentenced to a period of incarceration. General deterrence is being achieved by sentencing almost all of these defendants with a period of incarceration. The public is being made aware, over and over again, that individuals who engage in this sort of

conduct will be caught, prosecuted, and punished. General deterrence does not require Mac to be sentenced to a lengthy period of incarceration. A period of incarceration, however long, is not a slap on the wrist and will not be viewed as a trivial consequence for Mac's actions. How much time may be subject to an analysis of that unique defendant and the circumstances of their case. But nonetheless, the District of Columbia has sent a strong message.

## C.   Just Punishment

In determining what constitutes "just punishment," it is significant that a felony conviction, standing alone, is an extremely significant punishment for a defendant like Mac who has no felony background. *See, e.g., United States v. Engler*, 806 F.2d 425, 440 (3d Cir. 1986) ("[I]t has been traditionally recognized that collateral consequences of felony convictions are both inevitable and serious"); *Parker v. Ellis*, 362 U.S. 574, 593-94 (1960) (Warren, C.J., dissenting) ("[C]onviction of a felony imposes a status upon a person which … seriously affects his reputation and economic opportunities"). The Court may also consider the consequences Mac has already experienced, such as the damage to his reputation, the publishing of his personal information, and fictitious negative reviews about his business online, as well as fictitious negative reviews about his daughter's business online. Mac's business has lost a great deal of business due to members of the community boycotting him. Prospective customers have boycotted him. Mac has also placed his children and wife in jeopardy of facing public condemnation for his actions.

Given Mac's history and characteristics, the nature and circumstances of his offense, the collateral consequences of his conviction, and his low risk of recidivism, a sentence far below the low-end of the Guidelines range would be just punishment for Mac.

## Conclusion

James McNamara failed that day – of this there is no dispute. As this Court well knows, each defendant is unique, and the Court must consider the defendant's offense and particular circumstances. The Court must also consider our justice system's sentencing scheme and purpose when determining a fitting punishment. Within that scheme is rehabilitation and the risk of recidivism. Which is why a district court is empowered with significant discretion when determining an appropriate punishment. Mr. McNamara respectfully requests this Court to consider a sentence considerably below the low-end of the Guidelines, along with any other conditions the Court deems necessary, fair, and just. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing articulated in 18 U.S.C. § 3553(a).

August 3, 2023                    Respectfully submitted,


 /s/ Thomas M. Breen

Thomas M. Breen
Robert W. Stanley
Christopher W. Dallas
BREEN & PUGH
53 W. Jackson Blvd., Suite 1550

21

Chicago, Illinois 60604
(312) 360-1001 (t)
(312) 362-9907 (f)
tbreen@breenpughlaw.com
rstanley@breenpughlaw.com
cdallas@breenpughlaw.com

*Attorneys for James McNamara*

## Certificate of Service

The undersigned attorney hereby certifies that the foregoing document was served on **August 3, 2023**, in accordance with Federal Rule of Criminal Procedure 49, Federal Rule of Civil Procedure 5, Local Rule 5.5, and the General Order on Electronic Case Filing (E.C.F.) pursuant to the district court's system as to E.C.F. filers.


By:   /s/ Thomas M. Breen